# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Annette Wagner,<br><br>        Plaintiff,<br><br>v.<br><br>Catalent Pharmaceutical Solutions, LLC,<br><br>        Defendant. | Civil Action No.<br>3:18-cv-10065 (PGS) (DEA)<br><br>**MEMORANDUM<br>AND ORDER** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on a motion filed by Defendant Catalent Pharmaceutical Solutions, LLC, to dismiss the amended complaint. In this action, Plaintiff brings claims under the New Jersey Conscientious Employee Protection Act (NJCEPA), N.J. Stat. Ann. § 34:19-1 to -14; the federal False Claims Act (FCA), 31 U.S.C. § 3730(h), and the New Jersey Law Against Discrimination (NJLAD), N.J. Stat. Ann. § 10:5-1 to -42. Defendant argues New Jersey Law does not apply to this claim, which arises out of Plaintiff's employment in Kentucky and that Plaintiff has not adequately alleged FCA retaliation.

## BACKGROUND

On June 16, 2017, Plaintiff Annette Wagner began working as Director of Product Development for Defendant. (Amended Complaint, ECF No. 8, at ¶ 5). A resident of Kentucky, Plaintiff worked in a plant owned by Defendant in Winchester, Kentucky. (*Id.* at ¶ 5,6). Defendant – a Delaware corporation with a principle place of business in New Jersey – is a "development, delivery and supply partner for drugs, biologics and consumer health products." (*Id.* at ¶ 7).

Plaintiff reported directly to Scott Gunter, the Vice President of Quality Assurance and Regulatory Affairs, who worked in Defendant's home office in Somerset, New Jersey. (*Id.* at ¶ 5).

Plaintiff received an offer letter on May 3, 2016, which notified her that she would be required to sign a confidentiality agreement; she accepted the offer the next day. (Certification of Kristen J. Feher ("Feher Cert."), ECF No. 10-2, Ex. A, May 3, 2016 Offer Letter, at 3). On her first day of employment, she signed the confidentiality agreement, which provided, in part: "This Agreement shall be governed by and interpreted in accordance with the laws of the State of New Jersey, without giving effect to conflict of law rules." (Feher Cert., Ex. B, Catalent Confidentiality Agreement, ¶ 9). The confidentiality agreement also provided, "Employee understands and agrees that this Agreement is not to be construed as a contract for a promise of continued employment." (*Id.* at ¶ 4); and it furthered, "This Agreement is the complete agreement between the parties *with respect to the subject matter thereof.*" (*Id.* at ¶ 5 (emphasis added)).

Shortly after Plaintiff began her employment, she allegedly observed violations of Current Good Manufacturing Guidelines and the company's standard operating procedures ("SOP"). (*Id.* at ¶ 19). During her short employment, from 2016 to 2017, Plaintiff noted various violations relating to improperly training manufacturing employees, failing to complete deviation investigation reports, and falsifying documents. (*Id.* at ¶ 19, 23).

In a meeting with over fifteen management employees, Plaintiff reported the various violations. (*Id.* at ¶ 24). Quality Assurance Manager Kris Burchette responded "that the training problem had been identified during internal audits for several years, but that no one had taken action to correct it." (*Id.*). Later, Brian Lane, another quality assurance manager, allegedly admitted he failed to review his reports against the SOP requirements. (*Id.* at ¶ 27). Moreover, Plaintiff reported these items to the head of quality assurance, but no action was taken. (*Id.*).

In December 2017, Plaintiff reported to her general manager, interim director of operations, and facility safety officer – all of whom were located at the Winchester facility – that the pharmaceutical chemical she was working with stained the workers' skin and clothing, which she believed posed a contamination risk. (*Id.* at ¶ 28). No party responded to Plaintiff's concerns. (*Id.* at ¶ 29).

On one occasion (of unknown date), a quality assurance director told Plaintiff she was on a "witch hunt." (*Id.* at ¶ 30). A human resources director told her "that there was too much turmoil at the Winchester facility for her to move forward with a formal complaint." (*Id.*). The HR director also told Plaintiff to ignore the purported violations. (*Id.* at ¶ 31).

Plaintiff reported to the director of operations that no one was following the SOP for maintenance of tablet tooling. (*Id.*). The director allegedly told her that the SOP had only been in place a couple years, and had not yet been implemented. (*Id.*). Plaintiff alleges that the Vice President of Quality Assurance requested that she should not document any violation or report it to the client. (*Id.*). Plaintiff told her immediate supervisor about her uneasiness with these responses and the need to remedy the violations. (*Id.*).

The complaint alleges that as Plaintiff "continued to uncover more of such violations, [her] role at the Winchester facility was restricted by Defendant so she would have less responsibility to identify these issues. This included eliminating her oversight of the investigation team, and her authority to hire. (*Id.* at ¶ 33). Despite same, Plaintiff apparently continued to report the perceived violations. (*Id.* at ¶ 35).

On June 16, 2017, Defendant terminated Plaintiff. (*Id.* at ¶ 36). Defendant claimed she was laid off due to restructuring. (*Id.* at ¶ 37). Plaintiff alleges that another individual, Larry Lawless, belonged to the same division and reported to the same supervisor, but Lawless was not terminated.

(*Id.*). She further alleges that "several other managers received significantly worse across-the-board ratings than [Plaintiff]," including Lawless. (*Id.* at ¶ 38). After she was terminated Defendant "advertised an opening for the position Plaintiff held at the Winchester facility." (*Id.* at ¶ 39).

Plaintiff filed this complaint on June 1, 2018, alleging retaliatory discrimination, in violation of NJCEPA (Count I); retaliatory discrimination in violation of the FCA, 31 U.S.C. § 3730(h) (Count II); and gender-based discrimination, under NJLAD (Count III).

## LEGAL ANALYSIS

On a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir. 1994). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal*, 556 U.S. at 678-79; *see also Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir. 1997). A complaint should be dismissed only if the well-pleaded alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium*, 214 F.3d 395, 397-98 (3d Cir. 2000).

"[A] court may consider certain narrowly defined types of material without converting the motion to dismiss" into a motion for summary judgment, *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999), including documents "*integral to or explicitly relied upon in the complaint,*" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)

(quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)). Such material includes "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256 260 (3d Cir. 2006).

## Choice of Law

Defendant first argues that Counts I (NJCEPA) and III (NJLAD), which set forth claims under New Jersey law, must be dismissed because (a) the choice of law provision in Plaintiff's confidentiality agreement does not apply to general disputes arising from the employment relationship and thus does not permit Plaintiff to bring New Jersey-law claims; and (b) New Jersey does not otherwise have a sufficient interest in or connection to this dispute to justify applying New Jersey law.

### *Confidentiality Agreement*

The choice-of-law rules of the forum state govern "which body of substantive law to apply to a contract provision, even where a contract contains a choice-of-law clause." *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017). According to New Jersey's choice-of-law rules, "ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice.'" *Id.* at 184 (quoting *Instructional Sys., Inc. v. Computing Curriculum Corp.*, 130 N.J. 324 (1992)). However, a choice of law provision is limited in application "to the underlying agreement itself, and not to related fraud or non-contractual claims." *Black Box Corp. v. Markham*, 127 Fed. App'x 22, 25 (3d Cir. 2005).

The choice-of-law provision at issue here dealt with confidential information Plaintiff acquired in the course of her employment, not to her employment generally. It explicitly stated that it was not "a contract for a promise of continued employment." (Feher Cert., Ex. B, Catalent

5

Confidentiality Agreement at 2). Even absent that provision, the contract itself is unquestionably not Plaintiff's employment agreement. It is entitled "confidentiality agreement" and the entire subject matter of the agreement relates to the confidentiality of information. Further, the fact that there appears to be no written document governing the employment relationship does not transform the confidentiality agreement into the employment agreement; the employment relationship, though not reduced to writing was clearly a separate and distinct agreement. *See Corestar Intern. Pte. Ltd. v. LPB Comm., Inc.*, 513 F. Supp. 2d 107, 115-16 (D.N.J. 2007).

The Court similarly rejects Plaintiff's argument that the confidentiality agreement "was incorporated into the [o]ffer [l]etter as a condition of employment," and thus it governs the terms of Plaintiff's employment. (Defendant's Brief, ECF No. 17 at 11). Plaintiff primarily relies upon *Collins*, which, analyzing a forum selection clause under New Jersey law, considered the validity – not the scope – of a choice-of-law clause in a contract. *Collins*, 874 F.3d at 184-85. The two contracts at issue in *Collins* "set forth the general terms and conditions of their relationship." *Id.* at 179.

By contrast, here, the confidentiality agreement only set forth the terms relating to "information of a confidential or secret nature that may be learned or developed by [the] Employee during the period of employment." (Feher Decl., Ex. B, at ¶ A). The Court therefore concludes the choice-of law provision in the confidentiality agreement does not apply to this claim.

*Choice of Law*

Moreover, New Jersey's choice-of-law rules weigh against applying New Jersey's law to the dispute at issue here. New Jersey has "adopted the Restatement's most-significant-relationship test . . . as the paradigm for deciding which state's substantive law applies." *In re: Accutane Litigation*, 235 N.J. 229, 257 (2018) (citing Restatement (Second) of Conflict of Laws (Am. Law

Inst. 1971, amended 1988) (hereinafter, "Restatement")). That test "embodies all the elements of [New Jersey's] former governmental-interest test and adds 'a series of other factors deemed worthy of consideration.'" *Id.* (quoting *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 142 n.4 (2008)).

Under the governmental-interest analysis, "the determinative law is that of the state with the greatest interest in governing the particular issue." *D'Agostino v. Johnson & Johnson, Inc.*, 133 N.J. 516, 523 (1993). Under the additional factors set forth in the Restatement, "the analysis begins with . . . the presumption that the law of the state where the injury occurred applies." *Accutane*, 235 N.J. at 259. "That presumption may be overcome if 'some other state has a more significant relationship with the parties and the occurrence based on an assessment of each state's contacts' viewed through the prism of section 145 [of the Restatement], which sets forth general principles for tort actions, and section 6, which lists overarching choice-of-law principles." *Id.* (quoting *McCarrell v. Hoffman-LaRoche, Inc.*, 227 N.J. 569, 590 (2017)).

Section 145 sets forth four significant state contacts in the context of this analysis:

    (a)    the place where the injury occurred;
    (b)    the place where the conduct causing the injury occurred;
    (c)    the domicil[e], residence, nationality, place of incorporation and place of business of the parties; and
    (d)    the place where the relationship, if any, between the parties is centered.

*Id.* (quoting Restatement § 145). Section 6 sets forth additional factors:

    (a)    the needs of the interstate and international systems;
    (b)    the relevant policies of the forum;
    (c)    the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
    (d)    the protection of justified expectations;
    (e)    the basic policies underlying the particular field of law;
    (f)    certainty, predictability and uniformity of result; and
    (g)    ease in the determination and application of the law to be applied.

*Id.* (quoting Restatement § 6(2)).

In the context of the former government interest analysis, "New Jersey courts have consistently applied the law of the state of employment to claims of workplace discrimination, and therefore only apply the NJLAD if the claimant was employed in New Jersey." *Peikin v. Kimmel & Silverman, P.C.*, 576 F. Supp. 2d 654, 657 (D.N.J. 2008). Retaliation claims also are governed by the law of the state in which a plaintiff was employed. *Brunner v. AlliedSignal, Inc.*, 198 F.R.D. 612, 614 (D.N.J. 2001).

The overwhelming majority of facts underlying this action indicate a significant connection to Kentucky, not New Jersey. Plaintiff resided and worked in Kentucky, and most of her supervisors were located in Kentucky. Further, the violations, which she observed, took place in Kentucky, and the majority of her complaints were made by Plaintiff in Kentucky to individuals located in Kentucky. The Court therefore concludes that the section 145 factors weigh strongly in favor of applying Kentucky law to this action.

Additionally, there is no indication that the section 6 factors mandate that New Jersey law applies. Based on the significant relationship to Kentucky, it appears the needs of the relevant judicial systems would be better served if this action were brought in Kentucky. Further, as discussed, the confidentiality agreement did not govern the overall employment relationship and thus did not give either party any reasonable expectation that New Jersey law would apply. Therefore, the Court finds that Kentucky, not New Jersey, law applies to this action. Plaintiff's New Jersey law claims are dismissed.

### False Claims Act Retaliation

Defendant next argues that the amended complaint fails to plead the requisite elements of an FCA retaliation claim. "The False Claims Act . . . anti-retaliation provision[] protect[s] employees against 'discharge,' 'threats,' 'harassment,' and any other discrimination." *Moore v.*

*Calif. Inst. Of Tech. Jet Propulsion Lab.*, 275 F.3d 838 (9th Cir. 2002) (quoting 31 U.S.C. § 3730(h)). To allege retaliation under the FCA, 31 U.S.C. §3730(h), a plaintiff "must show '(1) he engaged in protected conduct, (i.e., acts done in furtherance of an action under § 3730) and (2) that he was discriminated against because of his protected conduct.'" *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 110 (3d Cir. 2007) (quoting *Hutchings v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 182 (3d Cir. 2001)). "For a plaintiff to demonstrate that he was discriminated 'against "because of" conduct in furtherance of a False Claims Act suit, a plaintiff must show that (1) his employer had knowledge he was engaged in "protected conduct"; and (2) that his employer's retaliation was motivated, at least in part, by the employee's engaging in "protected conduct."'" *Id.* at 110-11 (quoting *Hutchins*, 253 F.3d at 186).

"An employee must engage in 'protected conduct' in order to assert a claim under § 3730(h). In addressing what activities constitute 'protected conduct,' the 'case law indicates that "protected conduct" requires a nexus with the in furtherance of "prong of a False Claims Act action."'" *Hutchins*, 253 F.3d at 187 (quoting *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 515 (6th Cir. 2000). Whether conduct is protected requires "a fact specific inquiry," which "can include internal reporting and investigation of an employer's false or fraudulent claims." *Id.* However, "an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations" is insufficient to constitute protected conduct. *Id.* at 187-88. "The False Claims Act is not 'an all-purpose antifraud statute,' . . . or a vehicle for punishing garden-variety . . . regulatory violations." *Universal Health Servs., Inc. v. United States*, 136 S.Ct. 1989, 2003 (2016).

A successful cause of action under § 3730(h) requires that Plaintiff's "employer was on notice of the 'distinct possibility' of False Claims Act litigation and retaliated against [the

employee] because of [her] 'protected conduct.'" *United States ex rel. Petras v. Simparel, Inc.*, 2015 WL 337472, at 9 (D.N.J. Jan. 26, 2015) (quoting *Hutchins*, 253 F.3d at 186). "[T]he False Claims Act prohibits only fraudulent claims *that cause or would cause economic loss to the government.*" *Garg v. Covanta Holding Co.*, 478 Fed. App'x 736, 741 (3d Cir. 2012) (quoting *Hutchins*, 253 F.3d at 179). "[O]nly actions which have the purpose and effect of causing the government to pay out money are clearly claims' within the purpose of the Act." *Hutchins*, 253 F.3d at 183.

Here, Plaintiff's reports to supervisors concerned various regulatory violations, which she cites: 21 C.F.R. § 211.22(a), 211.25(a), and 211.100(a)(b). (AC at ¶ 20-22). Those claims relate to the facility's failure to adequately train employees, (*Id.* at ¶ 24); her coworkers ignoring reviews that were required by federal regulations, (*Id.* at ¶ 26); and a failure by at least one team at the facility to implement current good manufacturing practices, (*Id.* at ¶ 31).

Although Plaintiff may have observed the regulatory violations alleged, her allegations are insufficient to connect this conduct to a false claim against the government. Plaintiff's allegation that "some of [the] drug products were necessarily sold to the federal government, such as the antiviral drug Tecovirimat," (AC at ¶ 32; 54), is unsupported by any specific factual allegations and conclusory; "not entitled to be assumed true," *Iqbal*, 556 U.S. at 681. Similarly, although she alleges that she observed "falsification of documentation SOP violations," (AC at ¶ 19), she does not allege that she specifically reported that observation to anyone. Like the plaintiff in *Hutchins*, Plaintiff "never threatened to report [her] discovery . . . to a government authority"; did not file a false claims act suit; and did not inform her "supervisors that [she] believed [the falsification] was 'illegal' or that the practice was fraudulently causing government funds to be lost or spent." *Hutchins*, 253 F.3d at 187. Likewise, Plaintiff's reports to supervisors of regulatory violations did

not inform Defendant that she "intended to use [the] information in furtherance of a *qui tam* action or that [she] was going to report it to the government authorities because [she] believed [Defendant] was defrauding the government." *Id.* at 193. Therefore, the reports she did make only concerned garden variety regulatory violations, unaccompanied by anything that would put Defendant on notice of the distinct possibility of FCA litigation.

Finally, Plaintiff requests that dismissal, if warranted, be without prejudice to allow her to provide "more specific facts on the allegations in paragraph 56 of the Amended Complaint," (Plaintiff's Brief, ECF No. 17 at 19), a matter within the Court's discretion. *See Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000). The Court shall grant Plaintiff's request and allow her to file an amended complaint.

## ORDER

Having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments set forth orally on November 27, 2018; for the foregoing reasons, and for good cause shown;

IT IS on this 17 day of April, 2019,

**ORDERED** that Defendant's motion to dismiss, (ECF No. 10), is granted; and it is further

**ORDERED** that Plaintiff's complaint is dismissed; and it is further

**ORDERED** that Plaintiff has thirty days from the date of this order to file an amended complaint.

PETER G. SHERIDAN, U.S.D.J.